IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK McDONOUGH,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      No. 06 C 2732
                                      )
CITY OF CHICAGO, et al.,              )
                                      )
            Defendants.               )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

        Plaintiff Patrick McDonough ("McDonough" or "Plaintiff") alleges that defendants the

City of Chicago (the "City"), Alexander Vroustouris ("Vroustouris"), Richard Rice ("Rice"),

Brian Murphy ("Murphy"), and Tommie Talley ("Talley") (collectively, "the City Defendants"),

defendant Thomas Briatta ("Briatta"), defendant Michael Tierney ("Tierney"), and defendant

Donald Tomczak ("Tomczak")[1] retaliated against McDonough for engaging in constitutionally

protected speech in violation of McDonough's First Amendment and Equal Protection rights

(Counts I and II) and conspired to deprive McDonough of his constitutional rights (Count III) in

violation of 42 U.S.C. § 1983.  (Am. Compl., Dkt. No. 188, ¶¶ 41-60.)  McDonough also alleges

that the City is liable for violations of the consent decree entered into in the *Shakman* case (69

CV 2145) (Count IV) and for retaliation under the Illinois False Claims Act (Count V).  (*Id.* ¶¶

_____

[1] Tomczak has never appeared and has taken no actions to defend himself in this case to
date.  The filed motions do not specifically address the claims against Tomczak, and this court
does not make any rulings with respect to the claims against Tomczak.  The court refers only to
the City Defendants, Briatta, and Tierney in its use of the collective term "Defendants" in this
memorandum opinion and order.

1

61-76.)

Now pending before the court are three motions for summary judgment filed by the City Defendants, Tierney, and Briatta. For the reasons set forth below, the City Defendants' motion for summary judgment (Dkt. No. 234) is granted, Tierney's motion for summary judgment (Dkt. No. 238) is granted, and Briatta's motion for summary judgment (Dkt. No. 230) is granted in part and denied in part.

BACKGROUND

In November 1999, McDonough was hired as a plumber for the City's Water Department[2] and was assigned to work in the North District. (Am. Compl., Dkt. No. 188, ¶¶ 3, 12; Defs.' Joint SOF, Dkt. No. 237, ¶ 2.) Starting in December 1999 and continuing to about June 2005, Rice served as Commissioner of the Water Department. (Defs.' Joint SOF, Dkt. No. 237, ¶ 4.) Murphy served as First Deputy Commissioner from about January 2005 until he succeeded Rice as Commissioner in 2006. (*Id.* ¶¶ 4-5.) Tomczak served as First Deputy Commissioner from 1989 to about January 2004. (Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 5.)

The City's Water Department has historically been divided into five bureaus, one being the Bureau of Operations and Distribution, which employs virtually all of the manual laborers and skilled tradesmen in the Water Department. (Defs.' Joint SOF, Dkt. No. 237, ¶ 6.) Talley has been the Deputy Commissioner of the Bureau of Operations and Distribution since about

---

[2] As of January 1, 2003, the Department of Water and the Department of Sewers merged to become the Department of Water Management. (Defs.' Joint SOF, Dkt. No. 237, ¶ 3.) The parties do not distinguish between these departments in their filings, so the court will simply refer to these entities collectively as the "Water Department," generally.

June 2003. (*Id.*) Operations and Distribution is further divided into three geographic Districts of the City: North, Central, and South. (*Id.* ¶ 7.) Tierney was the Superintendent of the North District from 1998 until he retired in 2006. (*Id.*)

Each District has a number of District Foremen, who are each in charge of two to four work crews. (*Id.* ¶ 8.) Each work crew is typically headed by a crew Foreman, who reports to one of the District Foremen. (*Id.*) A Foreman's crew typically consists of eight to ten employees, including a variety of laborers, motor truck drivers, hoisting engineers, plumbers, caulkers, bricklayers, and cement finishers. (*Id.*) Briatta was a Foreman in the North District from about 1993 until he retired in October 2005. (*Id.*) Vroustouris was the City's Inspector General from November 1989 until July 2005. (*Id.* ¶ 10.)

It is undisputed that, for many years during McDonough's tenure with the Water Department, he complained about a number of practices that he contends were not ethical, legal, or safe. (*See, e.g.,* Defs.' Joint SOF, Dkt. No. 237, ¶ 20 ("over the years, McDonough made 'at least 400 oral complaints and grievances' to Tierney alone") (quoting Defs.' Joint Materials in Supp. of Summ. J., Ex. 15 (Pl.'s Resp. to Def. Tierney's First Set of Interrogs.) ¶ 12).) McDonough's complaints are both broad in scope and voluminous in number. Because McDonough "does not contend that every one of his complaints about his work environment constituted constitutionally protected speech" (Pl.'s Resp., Dkt. No. 251, at 10), the court limits its recitation of the facts to the types of complaints relevant to the court's analysis.

In December 1999, McDonough told crew members that they should not be drinking on City time during a Christmas party. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 11-12.) He also complained to the Inspector General's Office ("IGO") in 2003 or 2004 that Briatta and his crew

members had been drinking and gambling on a job site. (*Id.* ¶¶ 25, 41; Pl.'s Add'l SOF, Dkt. No. 252, ¶ 51.) The parties dispute whether there is any evidence that Briatta knew of McDonough's complaints to the IGO. (Defs.' Joint SOF, Dkt. No. 237, ¶ 41; Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 41.)

In 2001 and 2002, McDonough complained to a number of individuals, including the Commissioner's Office, that promotions in the Water Department were granted on the basis of political connections. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 14, 18; Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 18.) Beginning in 2001, McDonough also complained to various individuals, including Tomczak and the IGO, that workers who had political clout got better overtime assignments within the Water Department. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 14, 29; Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 4-5.) The parties dispute whether McDonough also complained to Tierney and Rice about the unfair distribution of overtime. (Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶¶ 5-6.) McDonough's complaints about the unfair distribution of overtime continued over a number of years. (*Id.* ¶ 5.)

Finally, from 2001 to 2003, McDonough complained to various people within the Water Department, including Rice's secretary and Tomczak, that trucks hired by the City were not actually performing any work (hereinafter "the Hired Trucks issue"). (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 15-16; Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 3, 6.) McDonough contacted the IGO with his concerns about the Hired Trucks issue in 2001, April 2003, June 2003, January 2004, and October 2004. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 30, 33, 50; Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 4, 17, 67, 72-73.) McDonough also contacted a columnist for the *Chicago Sun-Times* about this issue in August 2003. (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 55.) Beginning in January 2004, the

*Chicago Sun-Times* ran a series of columns about the Hired Trucks issue, citing a confidential source known as "Deep Water" that was later revealed to be McDonough. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 43, 53, 112; Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 65, 77.) In the resulting criminal prosecutions, several people entered guilty pleas, including former First Deputy Commissioner Tomczak. (Am. Compl., Dkt. No. 188, ¶ 24; City Defs.' Am. Ans., Dkt. No. 203, ¶ 24; Pl.'s Add'l SOF, Dkt. No. 252, ¶ 8.) The parties dispute which of the Defendants were aware of McDonough's reports to the Inspector General and the media at different times. (Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 24, 33, 63; Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶¶ 24, 33, 63.)

Turning to McDonough's allegations of retaliatory conduct, it is undisputed that McDonough bid for at least nine promotions during his tenure at the Water Department, and that he was not promoted to any of the positions for which he submitted a bid. (Defs.' Joint SOF, Dkt. No. 237, ¶ 65.) From 2001 to 2004, McDonough also received less overtime than a majority of the other plumbers and caulkers in the Water Department. (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 42.) McDonough was formally disciplined on three occasions, receiving a written reprimand on April 16, 2003, a one-day suspension on January 27, 2004, and a three-day suspension on March 3, 2004. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 84, 87-89, Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 19, 66, 69.) The parties disagree whether these facts support McDonough's claims for retaliation, as discussed in detail below.

McDonough also claims that Briatta verbally harassed and threatened McDonough, allegedly calling him a "rat motherfucker" on numerous occasions. (Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 32, 35, 47-48.) This assertion is disputed by Defendants. (Defs.' Joint Resp. to Pl.'s

Add'l SOF, Dkt. No. 292, ¶¶ 32, 35, 47-48.)  The parties also dispute whether Tierney and Talley engaged in verbal harassment of McDonough, and whether McDonough was inappropriately transferred from crew to crew.  (Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 49, 51; Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶¶ 49, 51.)

It is undisputed that McDonough's employment with the City's Water Department was terminated in April 2005 on the grounds that he violated the City's residency requirement and failed to cooperate with an investigation of the residency charge by the IGO.  (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 106, 111; Pl.'s Add'l SOF, Dkt. No. 252, ¶ 76.)  McDonough's termination was subsequently rescinded in January 2006, after McDonough prevailed, in part, on appeal to the City's Personnel Board.  (Defs.' Joint SOF, Dkt. No. 237, ¶ 122.)  McDonough was reinstated to his position as a plumber with the Water Department, but was reassigned to the Central District.  (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 85.)  The parties dispute whether the investigation by the IGO, the termination of McDonough's employment, and his reassignment to the Central District upon his reinstatement were retaliatory in nature.

LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 277, 248 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, the nonmoving party must present

definite, competent evidence to rebut the motion for summary judgment.  *Butts v. Aurora Health*

*Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

When ruling on a motion for summary judgment, the court views the evidence in the light

most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's

favor.  *Poer v. Astrue*, 606 F.3d 433, 438-39 (7th Cir. 2010).  In the analysis that follows, the

court therefore construes the record in the light most favorable to McDonough.

ANALYSIS

The court need not engage in a detailed analysis of McDonough's Equal Protection claim

(Count II) or his conspiracy claim (Count III), in light of McDonough's statement that he "does

not oppose Defendants' motion with respect to his Equal Protection, *Monell*, and conspiracy

claims."  (Pl.'s Resp., Dkt. No. 251, at 7 n.3.)  Accordingly, judgment is entered in favor of

Defendants on Counts II and III, and in favor of the City on the remaining *Monell* claim (Count

I).

The court begins its analysis of the three remaining claims—McDonough's claims for

violation of his First Amendment rights (Count I), violation of the *Shakman* consent decree

(Count IV), and retaliation under the Illinois False Claims Act (Count V)—with the issue of

timing, as Defendants have argued that the applicable statutes of limitations bar this court from

considering certain evidence in support of each of these claims.

I.       Applicable Statutes of Limitations & Continuing Violation Doctrine

McDonough initiated this lawsuit on May 16, 2006.  The statute of limitations for § 1983

claims is two years.  *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993).  Defendants

therefore contend that McDonough's First Amendment claims are time-barred to the extent that

they are based on conduct prior to May 16, 2004.  (Tierney's Mem. in Supp. of Summ. J., Dkt.

No. 239, at 3; Briatta's Mem. in Supp. of Summ. J., Dkt. No. 232, at 5; City Defs.' Mem. in

Supp. of Summ. J., Dkt. No. 235, at 38.)  Similarly, the City Defendants argue that

McDonough's *Shakman* claim cannot be based on conduct that occurred prior to November 16,

2005, in light of the Seventh Circuit's holding that "the 180-day period of limitations established

by Title VII applies to contempt proceedings under the *Shakman* decree."  *Smith v. City of*

*Chicago*, 769 F.2d 408, 413 (7th Cir. 1985) (*see* City Defs.' Mem. in Supp. of Summ. J., Dkt.

No. 235, at 50; City Defs.' Reply, Dkt. No. 291, at 27.)  Finally, the City Defendants argue that

McDonough's claim for retaliation under the Illinois False Claims Act cannot be based on

conduct that occurred prior to May 16, 2005, in light of that statute's one-year limitations period.

(City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 53 (citing 745 ILCS § 10/8-101(a).)

McDonough argues that all of the evidence in support of his claims should be considered

under the "continuing violation doctrine."  (Pl.'s Resp., Dkt. No. 251, Dkt. No. 251, at 7-9.)  "A

plaintiff can obtain relief . . . for time-barred acts by linking them with an act that is within the

statute of limitations through the continuing violation doctrine."  *Fairley v. Andrews*, 300 F.

Supp. 2d 660, 670 (N.D. Ill. 2004) (citing *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992)).

Factors to consider in determining whether a series of acts constitute a continuing violation

include "1) whether the acts involve the same subject matter; 2) the frequency with which the

acts occur; and 3) the degree of permanence of the alleged acts of [retaliation] that should trigger an employee's awareness and duty to assert his rights." *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002) (citing *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999)). The continuing violation doctrine will apply to a series of acts "only if their character was not apparent when they were committed but became so when viewed in the light of the later acts." *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir. 1993).

> Acts that fall outside the statute of limitations may be joined to an act within the statute only if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that [he] had a claim; rather, [he] could only tell by hindsight that the untimely acts represented the early stages of harassment.

*Garrison v. Burke*, 165 F.3d 565, 569-70 (7th Cir. 1999) (internal citations omitted). "[I]f the employee knew, or with the exercise of reasonable diligence should have known, that each act, once completed, was discriminatory, the employee must sue upon that act within the relevant statutory period." *Tinner*, 308 F.3d at 708.

McDonough's deposition included the following exchange of questions and answers:

Q. Okay. At what point did you feel that you were being retaliated against by the city or its employees because of your complaints?

A. I believe – let me correct that. Since 2001.

Q. So would it be fair to say that since 2001, you felt that the city and some of its employees were retaliating against you because of your complaints about the city?

A. Yes.

(Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 2, 23:16-24:1.) McDonough subsequently clarified that he felt retaliated against in 2001 in the form of "lost opportunity," because he had complained about overtime fraud. (*Id.* at 24:11-15.) McDonough also testified

that, on April 16, 2003, he told others that he was being written-up "because of [his] complaints." (*Id.* at 944:22-945:6.) McDonough did not specify whether the April 16, 2003 retaliation was in response to any specific complaint. (*Id.*) The record also reflects that McDonough complained to the Illinois Department of Labor on June 25, 2003, that he had been retaliated against in June 2002 "when [he] reported another truck." (Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 20.) Citing this evidence, the City Defendants argue "[t]he continuing-violation doctrine thus cannot apply here, as McDonough cannot show the alleged practice of retaliation was unknown to him and undiscoverable through reasonable diligence." (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 39.)

In response, McDonough asserts that "[i]t was not until October 2004, when he was interviewed by the IGO for an alleged residency violation, that he realized the earlier discipline, denial of promotions, denial of overtime, and harassment were part of a pattern of discrimination against him in retaliation for his protected speech." (Pl.'s Resp., Dkt. No. 251, at 9.) McDonough cites his own January 7, 2010 declaration in support of this assertion, which the relevant paragraph states in full:

> I knew that I was being retaliated against by the City and some of its employees for complaints that I had made in 2001. Specifically, I felt that I was shunned by my coworkers because I complained about time-sheet fraud. No one at the City took any other acts against me because of that complaint. After 2001, I made many other complaints about overtime fraud, promotion fraud, hired trucks, and other corruption to people within and outside of the Water Department. I was disciplined, denied overtime, denied promotions, and harassed during 2002 to 2004. But, it was not until I was interviewed by the Office of the Inspector General for an alleged residency violation that I realized that my supervisors and the Inspector General were actually trying to get me fired and that the earlier acts were part of a pattern of retaliation against me for the complaints I had made.

(Pl.'s Ex. B, Dkt. No. 271, ¶ 11.)

As a procedural matter, the court cannot consider any statements made by McDonough in his 2010 declaration that directly contradict testimony he gave at his 2008 deposition. *Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 623 (7th Cir. 2002). Accordingly, the court rejects any assertion that McDonough did not realize the discipline he received on April 16, 2003, or the ongoing denial of overtime since 2001 were retaliatory in nature. The undisputed evidence shows that McDonough was aware of these events and believed them to stem from the complaints he had made. It is irrelevant that McDonough did not realize until later "that [his] supervisors and the Inspector General were actually trying to get [him] fired and that the earlier acts were part of a pattern of retaliation against [him]." (Pl.'s Ex. B, Dkt. No. 271, ¶ 11.) McDonough *already* believed he was the victim of retaliation long before October 2004. Accordingly, no "series of adverse actions establish[ing] a visible pattern of discriminatory treatment" was needed to bring McDonough's retaliation claims into sharper focus. *Selan*, 969 F.2d at 566.

The court further finds that the discrete nature of certain events, such as McDonough's January 2004 and March 2004 disciplinary actions and the denial of his bids for promotion in 2000, 2001, and 2002, cuts against the application of the continuing violation doctrine. *See Tinner*, 308 F.3d at 708 (the court must consider "the degree of permanence of the alleged acts of [retaliation] that should trigger an employee's awareness and duty to assert his rights"). The official and permanent nature of each of these acts is such that a reasonable employee in McDonough's position would have been put on notice of a need to assert his rights at the time these events occurred.

It also appears from the record, viewing the facts in the light most favorable to McDonough, that the harassment McDonough suffered as a result of his complaints was sufficiently severe to put McDonough on notice of these potential claims for retaliation. For example, McDonough claims that Briatta told him on numerous occasions "I'm gonna kill you, you rat motherfucker," and that McDonough took these remarks seriously and felt threatened by them. (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 47.) Accepting McDonough's version of these events as true, it would have been clear to McDonough that he had an actionable claim for First Amendment retaliation at the time Briatta's remarks were made. In other words, this is not a case where "a series of wrongful acts" only later "blossoms into an injury on which suit can be brought." *Limestone Development Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008).

Because the evidence shows that McDonough was aware of the retaliatory nature of the various acts taken by Defendants from 2001 through 2004 at the time they occurred, the continuing violation doctrine is not applicable to McDonough's remaining claims. The court will therefore apply the appropriate statute of limitations, as set forth in detail below.[3]

II.      Count I – First Amendment

Count I of McDonough's Amended Complaint is brought pursuant to 42 U.S.C. § 1983 and alleges that McDonough's First Amendment rights were violated when he was retaliated against for engaging in protected speech. (Am. Compl., Dkt. No. 188, ¶¶ 1, 41-47.) To establish

---

[3] In his response, McDonough states, "Even if a claim for damages for some of the allegations in the Complaint would be time-barred, the underlying conduct itself is still relevant and admissible at trial." (Pl.'s Resp., Dkt. No. 251, at 9, n.4.) The admissibility of evidence relating to conduct prior to May 16, 2004 is a separate issue not addressed in this opinion.

a prima facie claim for a violation of First Amendment rights, McDonough must present evidence that "(1) [his] speech was constitutionally protected; (2) [he] suffered a deprivation likely to deter free speech, and (3) [his] speech caused the employer's action." *Gunville v. Walker*, 583 F.3d 979, 983-84 (7th Cir. 2009). Each of these elements is separately addressed in the analysis that follows.

A.    Constitutionally Protected Speech

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2007) (citations omitted). "Whether an employee's statement addresses a matter of public concern must be determined by the content, form and context of a given statement . . . ." *Connick v. Myers*, 461 U.S. 138 (1983) (internal citation omitted).

Tierney and the City Defendants argue that many of the complaints voiced by McDonough were particular to his job and not matters of public concern. (Tierney's Mem. in Supp. of Summ. J., Dkt. No. 239, at 5-6; City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 40-41.) According to the City Defendants, examples of complaints that do not touch on matters of public concern include:

> all of McDonough's various complaints about: the condition of Water trucks, the behavior of foremen (such as smoking and urinating in the street), inadequate drinking water and cups, his failure to obtain certain promotions, his job assignments, the amount of overtime he received, lack of shoring in ditches, the discipline he received, being called names or cursed at, coworkers getting in fights, how long job postings were up, and coworkers passing gas in his presence.

(City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 40.) Tierney argues that many of McDonough's complaints did not constitute protected speech, because McDonough was motivated by purely personal interests. (Tierney's Reply, Dkt. No. 288, at 4-5.)

13

McDonough "does not contend that every one of his complaints about his work environment constituted constitutionally protected speech." (Pl.'s Resp., Dkt. No. 251, at 10.) Rather, McDonough asserts that his complaints about "the Hired Truck corruption, the giving of overtime on the basis of political connections and bribes, the giving of promotions on the basis of political connections, and City workers gambling and drinking on City time were matters of public concern." (*Id.*)

It is clear that McDonough's reporting of the Hired Truck issue is a matter of public concern, and therefore falls within the category of protected speech. Furthermore, while general complaints about promotions, job assignments, and overtime are not necessarily matters of public concern by themselves, they may rise to the level of public concern if they involve decisions allegedly based on political considerations, or if they describe events that supposedly occurred in retaliation for reporting alleged political corruption. Issues that represent potential waste of taxpayer funds may also qualify as matters of public concern. Furthermore, whether McDonough's motivation for speaking on these matters was purely personal or out of concern for the public good is a question of fact for the jury to decide.

Therefore, McDonough's complaints about the Hired Truck issue, his complaints about overtime and promotions being based on political factors, and his complaints about City workers gambling and drinking on the job may all be considered matters of public concern protected by the First Amendment, and McDonough has met his burden at this summary judgment stage with respect to this first element of his First Amendment claim.

B.    Deterrence of First Amendment Activity

The second element that McDonough must demonstrate with respect to his First Amendment claim is that the "retaliatory activities would 'deter a person of ordinary firmness' from exercising First Amendment activity in the future." *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2007) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The issue is not whether the plaintiff was deterred, but rather whether a reasonable person would be deterred.

The City Defendants identify five major categories of deprivations—denial of promotions, denial of overtime, unwarranted discipline, unfounded investigation and termination, and adverse conditions of reinstatement—and concede that any of these types of acts would deter a reasonable person from speaking. (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 37.) The City Defendants argue that *other* allegedly retaliatory acts outside of those five categories, such being subjected to trivial verbal harassment, would not deter a reasonable person from speaking. (*Id.* at 37-38.) Likewise, Briatta contends that any purported verbal statements made to McDonough were "trivial and in no way discouraging to McDonough's exercise of his First Amendment rights." (Briatta's Reply, Dkt. No. 287, at 15.)

The details of Briatta's alleged harassment of McDonough are discussed in Section C.3. below. What these Defendants characterize as "trivial" (*id.*) or "minor slights and insults" (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 37-38), McDonough describes as "constant harassment and threats" that were "far from trivial" (Pl.'s Resp., Dkt. No. 251, at 11). Moreover, even if this harassment was "trivial in detail," it may nevertheless have been "substantial in gross." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). The question of whether this

15

harassment would deter a reasonable person from speaking is a question to be decided by the finder-of-fact, and the court finds that McDonough has presented sufficient evidence for this element of his First Amendment claim to survive a motion for summary judgment.

C.     Causation

The third element required for McDonough's First Amendment claim is the element of causation.

> Until the Supreme Court's recent decision in *Gross v. FBL Financial Servs., Inc.*, 129 S.Ct. 2343 (2009), plaintiffs could prevail in a First Amendment § 1983 action if they could demonstrate that their speech was a motivating factor in the defendant's decision. After *Gross*, plaintiffs in federal suits must demonstrate but-for causation unless a statute (such as the Civil Rights Act of 1991) provides otherwise.

*Gunville v. Walker*, 583 F.3d 979, 984 n.1 (7th Cir. 2009) (citing *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009)). Regardless of this change, at the summary judgment stage, the plaintiff simply must show that there is evidence from which a reasonable jury could find causation; "no more is necessary at this stage, but the instructions at trial must reflect the holding of *Gross*." *Fairley*, 578 F.3d at 526.

In his response, McDonough addresses the causation element separately with respect to each of the following allegedly retaliatory acts: (1) denial of promotions; (2) denial of overtime; (3) harassment and retaliatory transfer from crew to crew; (4) discipline; (5) IGO investigation and termination; and (6) adverse conditions of reinstatement. (Pl.'s Resp., Dkt. No. 251, at 12-33.) The City Defendants proceed in a similar fashion. (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 24-37.) For clarity, the court organizes its analysis in the same manner.

The court also first briefly addresses the issue of "suspicious timing." "[T]he causal link of a retaliation claim is frequently established by showing that there was a suspiciously short

period of time between the employee's complaint and the adverse employment action." *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007)). The City Defendants contend that McDonough made "*thousands* of complaints," often complaining "on an 'almost daily' basis." (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 24-25 (emphasis in original).) According to the City Defendants, "When an employee engages in protected activity nearly every day for ten years, the timing of any adverse action against him is irrelevant—because, *by necessity*, any adverse action against that employee is *always* going to happen shortly after a protected activity." (*Id*. at 25 (emphasis in original).) McDonough responds by pointing out that not every complaint he made qualified as protected speech, and that "[w]hen one focuses on McDonough's protected speech about Hired Trucks, a clear pattern emerges from which a reasonable jury could infer that the Defendants retaliated against him." (Pl.'s Resp., Dkt. No. 251, at 12.) In reply, the City Defendants argue that McDonough's complaints about Hired Trucks were made "all the time" to a "wide variety of people" (City Defs.' Reply, Dkt. No. 291, at 6) and that McDonough simply cannot show any suspicious timing even when he focuses solely on the Hired Truck complaints (*Id*. at 9).

The court need not determine as a general matter whether McDonough can support his retaliation claims with evidence of suspicious timing. However, the court remains cognizant of the parties' arguments on this issue in addressing McDonough's specific claims below.

1.     Denial of Promotions

McDonough bid for at least nine promotions during his tenure.[4]  (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 65-75; Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶¶ 65-75.)  The dates of these bids, along with the dates the positions were filled, were as follows:

| #  | Position | Bid Date | Fill Date |
|----|----------|----------|-----------|
| 1  | Plumbing Inspector | Feb 21, 2000 | June 1, 2000 |
| 2  | Foreman of Water Pipe Construction | May 1, 2000 | Aug 2000 |
| 3  | Pipe Locating Machine Operator | Nov 24, 2001 | Jan 29, 2002 |
| 4  | District Foreman of Water Pipe Construction | Dec 24, 2001 | Feb 8, 2002 |
| 5  | Foreman of Plumbers | Dec 24, 2001 | Jan 24, 2002 |
| 6  | General Foreman of Plumbers | Dec 24, 2001 | Jan 24, 2002 |
| 7  | Plumbing Inspector in Charge | Apr 22, 2002 | Sept 25, 2002 |
| 8  | Assistant Chief Plumbing Inspector | Apr 22, 2002 | May 28, 2002 |
| 9  | Assistant Superintendent | Apr 24, 2006 | Never Filled |

Because the first eight positions on this list were filled prior to May 16, 2004, claims related to these events are time-barred and the court need not address the issue of causation with respect to these promotions.[5]  The bid for the last position took place within the statute of limitations period, but the position was never filled and was ultimately eliminated.  (Defs.' Joint

---

[4] The parties dispute whether McDonough also applied for a position as Foreman of Water Pipe Construction in June 2000.  (Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 68.) Viewing the evidence in the light most favorable to McDonough, the court accepts that McDonough did bid for this promotion.

[5] There is no evidence in the record regarding the date that the June 2000 Foreman of Water Pipe Construction position was filled; however, the court finds the only reasonable inference that can be drawn from the record is that this position was filled sometime well before May 16, 2004, in light of the fact that each of the other open positions at the Water Department was filled within a period of less than six months after accepting bids for promotion.

SOF, Dkt. No. 237, ¶ 75; Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 75.)  There is no evidence that the decision to leave this position open and eventually eliminate it was in any way done in retaliation against McDonough.  McDonough therefore cannot prevail on his First Amendment claim to the extent that the claim is based on the allegedly retaliatory denial of promotions.

        2.    Denial of Overtime

McDonough contends that Tierney and Briatta deprived him of overtime based on his protected speech and a lack of political clout.[6]  McDonough contends that "[f]rom 2001 to 2004, [he] was consistently given less overtime than other plumbers and caulkers in the Water Department."  (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 42.)  For the reasons discussed earlier in this opinion, denial of overtime that occurred prior to May 16, 2004 is not actionable.  McDonough summarizes information regarding overtime hours for 2004 as follows:

> In 2004, McDonough ranked 23 out of 28 plumbers/caulkers in terms of overtime hours worked.  His overtime was only 1.6% of the total overtime hours worked in 2004.  If overtime had been distributed fairly, each plumber/caulker should have gotten 143.2 hours; McDonough got only 66.5 hours.  McDonough's 2004 daily calendar shows that he worked only 42 hours of overtime in 2004.

(Pl.'s Add'l SOF, Dkt. No. 252, ¶ 42 (internal citations omitted).)  It is not clear what portion of these hours were before or after May 16, 2004.

In addressing the issue of causation with respect to the denial of overtime hours, McDonough states that "Tierney and Briatta had a role in assigning and approving overtime."  (Pl.'s Resp., Dkt. No. 251, at 16.)  According to McDonough, "Tierney made the decision to assign overtime, . . . and Briatta (as foreman) decided whether to accept it."  (*Id*. at 16-17.)  The

---

[6] McDonough does not contend that Rice, Murphy, Vroustouris, or Talley deprived him of overtime.  (Pl.'s Resp., Dkt. No. 251, at 16, n.6.)

court assumes, for purposes of summary judgment, that both Tierney and Briatta were aware of McDonough's protected speech on or before May 16, 2004. The court first examines Tierney's role in assigning overtime, and then turns to Briatta.

Tierney explained that, pursuant to collective bargaining agreements, he "was allowed to assign overtime only to the foremen, who were free to accept or reject the voluntary overtime." (Tierney's Mem. in Supp. of Summ. J., Dkt. No. 239, at 7.) Accordingly, Tierney argues, he cannot be liable for denying McDonough overtime opportunities because he did not decide whether McDonough received overtime. (*Id.*) In response, McDonough argues that "even if a foreman did not want to accept overtime, Tierney could have put a worker from the crew in charge as foreman or bring in another foreman," and that "even after approval was given for overtime, Tierney had veto power over which member of a crew would be made temporary foreman (and therefore be given the additional pay)." (Pl.'s Resp., Dkt. No. 251, at 17.) Tierney goes on to argue that even if he had been responsible for the assignment of overtime hours, McDonough has failed to identify any specific overtime that he allegedly should have received. (Tierney's Mem. in Supp. of Summ. J., Dkt. No. 239, at 7.) In *Conley v. Village of Bedford Park*, 215 F.3d 703 (7th Cir. 2000), summary judgment was granted against a plaintiff who failed to "set forth any specific times that the [defendant] gave others overtime opportunities, but denied the same to him." *Conley*, 215 F.3d at 711.

McDonough points generally to the total overtime hours awarded in 2004. That information simply shows that 22 workers received more hours than McDonough did, while 5 workers received less. There has been no showing that those hours relate to the period after May 16, 2004, or that any specific 2004 hours should have been given to McDonough. Nor has there

been any showing that overtime decisions were made by Tierney (other than alleging that Tierney could have exercised his authority to change foremen or veto temporary foreman assignments, but did not), or that Tierney decided to act or refrain from acting out of a desire to retaliate against McDonough for his protected speech.  Therefore, McDonough's First Amendment claims against Tierney based on a denial of overtime hours cannot survive summary judgment.

Turning to Briatta's involvement in the overtime issue, Briatta argues that McDonough cannot identify any overtime jobs that he did not receive, and that McDonough cannot show that any overtime hours were manipulated based on McDonough's whistleblowing activities. (Briatta's Mem. in Supp. of Summ. J., Dkt. No. 232, at 6.)  McDonough argues that he "should have gotten overtime on the occasions that he worked for Briatta's crew" (Pl.'s Resp., Dkt. No. 251, at 19), and he identifies several specific dates when he worked on Briatta's crew (August 1, 4, 5, and November 18, 2003, February 19, 2004), and also identifies specific dates when he should have worked overtime (August 2-3 (Saturday and Sunday) 2003).  (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 31.)  However, as each of those dates precedes the applicable date for the statute of limitations (May 16, 2004), they are not actionable.  McDonough admits that he was not on Briatta's crew after May 16, 2004.  (Pl.'s Resp., Dkt. No. 251, at 19, n.7.)  Therefore, despite the fact that Briatta allegedly told McDonough that he was not going to get any overtime because he was a "rat motherfucker snitching" on the crew, and that "rat motherfuckers don't get overtime" (*Id.* at 19), McDonough's First Amendment claims against Briatta based on denial of overtime hours are precluded by the statute of limitations.

### 3. Harassment and Retaliatory Transfer from Crew to Crew

McDonough claims that he was subjected to frequent harassment and constantly moved from crew to crew in retaliation for his protected speech.[7] (Pl.'s Resp., Dkt. No. 251, at 21-25.) He points to Briatta, Tierney, and Talley as the individuals involved in this conduct. McDonough summarized the constant harassment he allegedly received from Briatta as follows:

> On a regular basis until the time he was placed on administrative leave in October 2004, Briatta constantly called McDonough a "rat motherfucker," "cocksucker," "prick," "snitch," "jag-off," "asshole," and "troublemaker." Briatta said to him at least twenty times, "I'm gonna kill you, you rat motherfucker." Briatta threatened to give McDonough "cement shoes," which McDonough understood to mean that Briatta was going to kill him by putting his feet in cement and throwing him into Lake Michigan. Every time that McDonough saw Briatta either in the yard or while he was on Briatta's crew, Briatta called him these names and threatened him. McDonough felt threatened and did not think these statements were funny. These comments weighed on him, and he worried that he might end up dead. McDonough did not see Briatta act this way towards other workers.

(*Id.* at 22 (citing Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 35, 47).) Bruce Randazzo, McDonough's truck driver, testified that he witnessed an incident where Briatta ran after McDonough with a wrench or hydrant key and wanted to cause McDonough bodily harm. (*See generally* Pl.'s Ex. W, Dkt. No. 286, 95-99.) Randazzo testified that Briatta said to McDonough, "You son [of a] bitch, I'm going to get you. I'm going to hit you with this wrench if I see you. I'm going to take that camera and shove it up your ass." (*Id.* at 99:4-6.) Randazzo also testified, "Well, every time they would see each other, Mr. Briatta would come after McDonough sayings [sic] bad words to him." (*Id.* at 98:19-21.)

---

[7] With respect to McDonough's allegations that he was given unsafe work assignments, "McDonough concedes there is no admissible evidence that Briatta gave others shoring [for the holes/trenches into which plumbers were being sent], yet denied it to McDonough in retaliation for his First Amendment activity." (Pl.'s Resp., Dkt. No. 251, at 21, n.8.)

Briatta denies that any of these things occurred. (Defs.' Joint Materials in Supp. of Combined Resp. to Pl.'s Add'l SOF, Dkt. No. 293, Ex. 8 ¶¶ 8-10.) Briatta argues there is no competent evidence that he verbally harassed McDonough. Briatta asserts that McDonough only alleged harassment on "general terms," and takes issue with the fact that McDonough was unable to recall exact dates and times of verbal harassment. (Briatta's Mem. in Supp. of Summ. J., Dkt. No. 232, at 8.) According to Briatta, "[t]he only conversations where McDonough comes close to establishing a foundation were those that McDonough alleges occurred when he was working on Briatta's crew on particular jobs," but that all of those conversations occurred before May 16, 2004. (Briatta's Reply, Dkt. No. 287, at 13.) Briatta also claims there is no causal link between McDonough's protected speech and the alleged teasing (Briatta's Reply, Dkt. No. 287, at 13), and that the alleged teasing was too trivial to be actionable under § 1983. (Briatta's Mem. in Supp. of Summ. J., Dkt. No. 232, at 8, 11-13; Briatta's Reply, Dkt. No. 287, at 14-15.) Briatta's last argument is that he would not have been acting under "color of state law" at the time of the purported harassment, because McDonough cannot establish that he was working under Briatta's supervision at the relevant times, and any such teasing would not have related to Briatta's duties. (Briatta's Mem. in Supp. of Summ. J., Dkt. No. 232, at 8, 9; Briatta's Reply, Dkt. No. 287, at 13-14.)

McDonough has supported his claims of harassment by Briatta with sufficient details and evidence to survive the motion for summary judgment on this point. With respect to timing, McDonough asserts that he was "constantly harassed" "on a regular basis" until October 2004. (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 47.) This includes time after May 16, 2004, such that the harassment claim would not be time-barred. As previously mentioned, "McDonough admits that

he was not on Briatta's crew after May 16, 2004" (Pl.'s Resp., Dkt. No. 251, at 19, n.7), but McDonough did not necessarily have to be assigned to Briatta's crew in order for harassment to occur between May 16, 2004 and October 2004. McDonough's descriptions also imply that the harassment was so constant that providing a list of dates would not be practicable or necessary. Furthermore, given that Briatta allegedly called McDonough a "rat" on a frequent basis, it would be reasonable for a jury to conclude that the cause of Briatta's purported harassment was the fact that McDonough had engaged in protected speech. Additionally, as discussed earlier, whether the harassment complained of was trivial or substantial is a disputed fact that is material to McDonough's claim, and a question for the jury. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

With respect to the issue of whether Briatta was acting under color of state law, it is true that "[n]ot every action by a state official or employee is to be deemed as occurring 'under color' of state law." *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001) (quoting *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989)). "[A]cts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office." *Honaker*, 256 F.3d at 485 (citations omitted). In this case, Briatta had served as McDonough's supervisor, and a reasonable jury could conclude that Briatta had authority over the circumstances and conditions of McDonough's employment. *See, e.g., Valentine v. City of Chicago*, 452 F.3d 670, 683 (7th Cir. 2006). Furthermore, a reasonable jury could conclude that the alleged harassment related directly to Briatta's responsibilities as supervisor, as some of Briatta's alleged statements suggested that he planned or threatened to take action affecting McDonough's employment, including statements and threats about McDonough not receiving

overtime,[8] getting fired, and not being assigned to Briatta's crew. (Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 35, 47.)

Continuing with the allegations of verbal harassment, McDonough argues, albeit in a footnote, that Tierney and Talley also "yelled and screamed at [him] on occasion." (Pl.'s Resp., Dkt. No. 251, at 23, n.10.) McDonough claims that Tierney harassed him "by screaming and yelling at him, slamming doors on him, and calling him a 'motherfucker,'" (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 49), and that Tierney "also refused to do anything about Briatta's harassment" (Pl.'s Resp., Dkt. No. 251, at 23, n.10; Pl.'s Add'l SOF, Dkt. No. 252, ¶ 50). Randazzo testified that Talley showed up and started "hollering or screaming" at McDonough at some of the job sites, conduct which Randazzo described as "verbal harassing." (Pl.'s Ex. W, Dkt. No. 271, 112:12-113:15.) These allegations do not rise to the same level as the allegations set forth against Briatta, as the "yelling" or "screaming" described was not particularly pervasive or severe. Furthermore, unlike the case with Briatta, none of the content of Tierney and Talley's alleged comments infers a causal link between McDonough's protected speech and the supposed harassment. Therefore, McDonough's claims based on verbal harassment by Tierney and Talley cannot survive summary judgment.

In addition to the verbal harassment, McDonough claims he was "constantly moved from crew to crew," which was "harmful and less desirable because (1) he would be moved off of a crew just before the crew was to get overtime; (2) he never knew what crew he would be on until the beginning of his shift; and (3) it made it less likely that he would get promotions or 'acting

---

[8] Even though the court has concluded that the denial of overtime hours was not actionable, testimony regarding overtime may still be considered potentially relevant support for McDonough's other claims.

up' pay." (Pl.'s Resp., Dkt. No. 251, at 25; Pl.'s Add'l SOF, Dkt. No. 252, ¶ 51.) McDonough

states that Tierney and Briatta were responsible for moving him from crew to crew. (Pl.'s Resp.,

Dkt. No. 251, at 25; Pl.'s Add'l SOF, Dkt. No. 252, ¶¶ 50-53.) Without more concrete

information regarding which moves were caused by which defendant, the timing of those moves,

and the circumstances of those moves, McDonough simply has not presented enough evidence

for this particular claim to survive a motion for summary judgment.

In summary, in considering McDonough's First Amendment claims based on alleged

harassment and crew transfers, summary judgment is denied with respect to the purported

harassment committed by Briatta, and summary judgment is granted with respect to the

purported harassment committed by Tierney and Talley, as well as the crew transfers allegedly

caused by Tierney and Briatta.

### 4. Discipline

McDonough cites three instances of being disciplined: (1) he was given "a written

reprimand on April 16, 2003; (2) he was given a one-day suspension on January 27, 2004; and

(3) he was given a three-day suspension in March 2004." (Pl.'s Resp., Dkt. No. 251, at 25.)

Each of these events occurred prior to May 16, 2004. They are therefore all time-barred, and

summary judgment must be granted for Defendants with respect to McDonough's First

Amendment claims based on these disciplinary actions.

In addition to these time-barred instances of discipline, McDonough alleges that "Tierney

purposefully lost between two to ten grievances and letters that McDonough gave him." (*Id.* at

27.) It is not clear when these grievances may have been lost, what they were in relation to, or

how the losses may have been caused by McDonough's protected speech. McDonough's First

Amendment claim cannot be supported on the basis of these supposedly lost grievances.

5.    IGO Investigation and Termination

Career employees of the City are required to be "actual residents" of the City of Chicago. (Defs.' Joint SOF, Dkt. No. 237, ¶ 93.)  Non-compliance with this requirement is grounds for a City employee's termination of employment.  (*Id.*)  On May 30, 2003 and August 15, 2003, the IGO opened two separate investigative files, Nos. 03-0943 and 03-1424, after receiving two separate anonymous tips that McDonough did not live at the Chicago address he had provided to the City (on West Catalpa Avenue).  (*Id.* ¶¶ 93-94.)  In addition to those anonymous tips, at some point in 2003 or 2004, someone left an anonymous handwritten note on Tierney's desk indicating that McDonough lived at a particular address outside of the city, information which Tierney relayed to Rice, then Commissioner of the Water Department, who in turn shared the information with Vroustouris, then Inspector General.  (*Id.* ¶ 95.)  Beginning in August 2003 and for several months thereafter, IGO investigators performed numerous surveillances of two addresses: the West Catalpa Avenue address in Chicago, and an Everett Street address in Des Plaines, where McDonough was alleged to live with his wife and children.  (*Id.* ¶ 96.)  After fifteen surveillances of the West Catalpa Avenue address and eighteen surveillances of the Everett Street address, investigators never observed McDonough or a vehicle owned by him at the West Catalpa Avenue address, but they observed McDonough coming or going from the Everett Street address during each instance of surveillance of that location.  (*Id.* ¶ 96.)

McDonough had meetings scheduled with IGO representatives on October 6, 14, and 18, 2004, though each of those meetings was rescheduled based on McDonough's requests to have union representation and/or an attorney present.  (*Id.* ¶¶ 97-100.)  McDonough appeared on

October 20, 2004 with his union representative, but after being told that he could not use a tape-recorder to record the proceedings (where a court reporter was already present), he left the meeting. (*Id*. ¶ 101.) McDonough and his union representative appeared again on October 27, 2004, at which time McDonough answered some questions, but refused to provide answers to other questions, responded with "no comment," or claimed not to remember the information. (*Id*. ¶¶ 102-03.) Also on October 27, 2004, the City placed McDonough on paid administrative leave, pending the outcome of the IGO's investigation. (*Id*. ¶ 105.) After completing its investigation, the IGO concluded McDonough had violated the City's residency requirement by residing in Des Plaines, and that McDonough had violated various personnel rules by providing false answers and failing to cooperate with the investigation, among other things. (*Id*. ¶ 106.) "Vroustouris issued a memo on February 1, 2005 to the Mayor's Office and other appropriate City departments stating these conclusions and recommending that McDonough be discharged for the violations." (*Id*.) The Law Department then prepared a Statement of Charges against McDonough, which was provided, read, and explained to McDonough in March 2005. (*Id*. ¶ 108.) On March 28, 2005, McDonough wrote a two-page letter to Rice, in which McDonough objected to the charges and complained about preferential treatment allegedly given to "people with clout." (*Id*. ¶¶ 109-10.) Rice then followed the Law Department's recommendation favoring termination of McDonough's employment, and made the decision to terminate McDonough's employment. (*Id.* ¶ 111.) This decision was communicated to McDonough via a letter dated April 1, 2005. (*Id*.)

The next day, April 2, 2005, the *Chicago Sun-Times* ran an article stating that "McDonough contended the city fired him for talking to the Sun-Times and federal prosecutors

about waste and corruption in the Hired Truck program." (*Id*. ¶ 112.)  This was the first time that McDonough's name appeared in the press in connection with the Hired Trucks scandal. (*Id.*)

McDonough appealed his termination to the City's Personnel Board.  (*Id*. ¶ 113.)  After eleven nonconsecutive days of hearings between June and October of 2005, Hearing Officer Carl McCormick found in favor of McDonough on the residency charge, concluding that the surveillance of the residence on West Catalpa Avenue was "fatally flawed" and "not reliable," and that McDonough may have entered the residence on West Catalpa Avenue through the back door on some or all of the instances when IGO investigators were observing that address.  (*Id*. ¶¶ 113, 118; Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 60 at 1444.) McCormick also concluded that the City had proved by a preponderance of the evidence that McDonough failed to cooperate with the IGO's investigation, and found that the evidence did not support any finding that the investigation or termination of McDonough was retaliatory. (Defs.' Joint SOF, Dkt. No. 237, ¶¶ 119, 121.)  McCormick recommended that McDonough receive a six-month suspension without pay, but that his discharge be rescinded and he receive back pay for the balance of the nine-and-a-half months since his termination, and the Personnel Board adopted these recommendations on January 24, 2006.  (*Id*. ¶ 122.)

The City Defendants contend that McDonough is barred from raising this claim on the basis of collateral estoppel, since the issue of retaliation was addressed before the Hearing Officer.  (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 32-34; City Defs.' Reply, Dkt. No. 291, at 15-17.)  In order for a prior ruling to have collateral estoppel effect,

> four elements must be met: "(1) the issue sought to be precluded must be the same
> as that involved in the prior litigation, (2) the issue must have been actually

litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action."

*H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496 F.3d 755, 760 (7th Cir. 2007) (citations omitted). McDonough contends that collateral estoppel does not apply because the first and third elements are missing. (Pl.'s Resp., Dkt. No. 251, at 28.) The City Defendants assert that those elements have been satisfied. Specifically addressing the third element, the City Defendants explain,

> In short, the Hearing Officer considered and rejected McDonough's retaliation arguments *because McDonough interposed them as a defense to the claim that he failed to cooperate with the IGO*. The Hearing Officer could not have made his ultimate ruling that McDonough unreasonably failed to cooperate without first addressing McDonough's argument that his failure to cooperate was excusable because the investigation was retaliatory. Accordingly, the resolution of the retaliation issue was essential to the final judgment in the prior action . . . .

(City Defs.' Reply, Dkt. No. 291, at 18) (emphasis in original).

It is undisputed that the Hearing Officer addressed McDonough's retaliation argument, stating that "[t]he evidence does not support the conclusion of finding of retaliation." (Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 60.) However, it is not clear that this issue was *essential* to the final judgment that McDonough failed to cooperate with the IGO investigation. It is possible that the Hearing Officer could have concluded that McDonough failed to cooperate with the investigation, even if that investigation was found to be retaliatory. A finding of a retaliatory motive does not necessarily mean that McDonough's failure to cooperate was reasonable or excusable. Therefore, the doctrine of collateral estoppel does not apply, and this court continues with its analysis of McDonough's First Amendment claim based on the residency investigation and McDonough's subsequent termination.

McDonough contends that Briatta, Tierney, Rice, and Vroustouris each had a role in this process, and the court separately examines each of these defendants.

     a.    <u>Briatta</u>

With respect to Briatta, McDonough claims that Briatta told Randazzo he wanted to get McDonough fired.  (Pl.'s Resp., Dkt. No. 251, at 28 (citing Pl.'s Add'l SOF, Dkt. No. 252, ¶ 56).)  However, wanting McDonough fired and causing McDonough to be fired are separate things.  McDonough admits that Briatta had no part in causing the IGO surveillance and had no part in the decision to place McDonough on paid leave for the winter of 2004/2005.  (Pl.'s Resp. to Briatta's SOF, Dkt. No. 249, ¶¶ 25, 26.)  McDonough has presented no evidence to suggest that Briatta participated in or caused the investigation or termination, therefore McDonough's First Amendment claim against Briatta cannot be based on this series of events.

     b.    <u>Tierney</u>

McDonough has alleged that Tierney "ordered [him] to participate in the pretextual investigation of the purported residence violations."  (Am. Compl., Dkt. No. 188, ¶ 39(c).)  Tierney claims that he "merely received a memorandum from the Assistant Commissioner requiring Tierney to direct McDonough to report to the [IGO]."  (Tierney's Mem. in Supp. of Summ. J., Dkt. No. 239, at 11; Defs.' Joint SOF, Dkt. No. 237, ¶ 153.)  The other role that Tierney played in this process was that he received an anonymous handwritten note regarding McDonough's residency, and he relayed this information to Rice, who then shared the information with Vroustouris.  (Defs.' Joint SOF, Dkt. No. 237, ¶ 95.)  McDonough points out that Tierney never bothered to ask McDonough about the note or McDonough's residence, but simply passed the information along, which McDonald contends Tierney would not have done

but for McDonough's protected speech.  (Pl.'s Resp., Dkt. No. 251, at 30-31.)  In support of his

position, McDonough points to Randazzo's testimony that Tierney asked Randazzo to monitor

McDonough because he wanted to "get" him.  (Pl.'s Ex. W, Dkt. No. 271, 130:2-134:10.)

Even accepting that Tierney wanted McDonough fired, the court again notes that wanting

someone fired and causing them to be fired are not the same.  Tierney did not make the decision

to investigate McDonough, he did not participate in the investigation, and he did not participate

in the decision to discharge McDonough.  In sharing the anonymous note and instructing

McDonough to participate in the investigation, Tierney did not cause or initiate anything, but

simply acted as a conduit for the information.  To contend that Tierney should have simply

ignored, hidden, or disregarded the anonymous note would be unreasonable.  Based on the

evidence provided, Tierney's involvement in this process was simply too limited for a reasonable

jury to conclude that he caused the investigation and termination, let alone that he did so to

retaliate against McDonough for protected speech.

      c.    <u>Rice</u>

McDonough also claims that Rice retaliated against him for engaging in constitutionally-

protected speech by initiating the IGO investigation and by approving McDonough's subsequent

termination.  It is undisputed that Rice relayed the information contained in the anonymous

handwritten note from Tierney to Vroustouris, and that Rice was the individual who ultimately

made the decision to terminate McDonough's employment following the conclusion of the IGO

investigation.  (Defs.' Joint SOF, Dkt. No. 237 ¶¶ 95, 111.)

McDonough stresses that, like Tierney, Rice never bothered to ask McDonough about the

note or his residence before reporting the information contained in the anonymous handwritten

note to Vroustouris. (Pl.'s Resp., Dkt. No. 251, at 30.) It is McDonough's contention that Rice only reported this information because he was targeting McDonough for his protected speech, as evidenced by the fact that Rice never reported any wrongdoing concerning the Hired Trucks issue or Donald Tomczak to the IGO, despite his knowledge of these problems. (*Id.* at 30-31 (citing Pl.'s Add'l SOF, Dkt. No. 252, ¶ 60).)[9] It is undisputed that Rice suspected McDonough was "Deep Water," even before his identity was revealed in the *Chicago Sun-Times* on April 2, 2005. (Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶ 63.)

One problem with this line of argument is that it is lacking foundation in the record. McDonough cites the testimony of an unidentified individual (presumably Vroustouris) at a September 7, 2005 hearing before the City's Personnel Board, in which the witness states that he or she does not recall whether Rice brought the Hired Trucks issue to the witness's attention in April 2003. (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 60 (citing Pl.'s Ex. C at 1064).) The City Defendants have objected to this testimony as lacking in foundation and personal knowledge. (Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶ 60.) Without more identifying information about this witness, the court finds there is insufficient evidence in the record to allow a fact-finder to draw a reasonable inference that Rice failed to report McDonough's complaints about the Hired Trucks to the IGO.

Moreover, even accepting that Rice did not report McDonough's complaints about the Hired Trucks to the IGO, this does not necessarily or reasonably suggest that Rice's handling of

_____

[9] Rice denies any implication that he knew about the Hired Trucks issue or wrongdoing by Tomczak (Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶ 60); however, the court views this disputed question of fact in the light most favorable to McDonough and accepts that Rice did know about the Hired Trucks issue during the relevant time period. (*See also* Pl.'s Add'l SOF, Dkt. No. 252, ¶ 6.)

the anonymous tip was motivated by a retaliatory animus. There is no evidence in the record about the manner in which Rice would normally treat an anonymous tip regarding a possible violation of the residency requirement. In other words, the jury could only speculate that Rice treated the anonymous tip about McDonough differently than he would have treated any other anonymous tip about a residency violation, and that he did so because of McDonough's protected speech. Because the court's "favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture,'" *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (citations omitted), the court finds there is insufficient evidence to support McDonough's claim that Rice reported the anonymous tip to Vroustouris only because of his desire to retaliate against McDonough for his protected speech.

Similarly, McDonough has produced no evidence to contradict the evidence that Rice made the decision to terminate McDonough's employment "because of the Law Department's recommendation favoring termination" and "cannot remember a time during his tenure as Commissioner when he went against a Law Department recommendation." (Defs.' Joint SOF, Dkt. No. 237, ¶ 111 (citing Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 4 at 204:16-207:6).) In short, McDonough has not provided sufficient evidence for a reasonable jury to infer that the aforementioned conduct would not have occurred but for McDonough's protected speech.

    d.   <u>Vroustouris</u>

In his position as the Inspector General, Vroustouris was responsible for opening the investigations into McDonough's residency in May 2003 and August 2003, and was ultimately responsible for the surveillance of the West Catalpa address in Chicago and the Everett Street

address in Des Plaines, the October 2004 interview of McDonough, and his recommendation to the Mayor's Office and other appropriate City departments that McDonough be discharged for violating the residency requirement and for failing to cooperate with the IGO investigation.

McDonough points to instances of supposedly suspicious timing to support a causal link between McDonough's complaints and Vroustouris' conduct. McDonough states that "[o]n August 15, 2003, ten days after McDonough talked to Mark Brown of the *Sun-Times* about Hired Trucks, Vroustouris created another case initiation report concerning McDonough's residency, even though the first investigation had been closed for lack of evidence." (Pl.'s Resp., Dkt. No. 251, at 30.) However, regardless of when McDonough may have talked to the press, there is no evidence showing when Vroustouris actually became aware that this communication had occurred. Given the rational explanation that the second investigation was opened in response to an anonymous tip received on August 15, 2003 (*see* Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 59), this 10-day period does not rise to the level of suspicious.

McDonough's second point regarding allegedly suspicious timing is that "[j]ust two weeks prior to the day that McDonough was placed on administrative leave (October 27, 2004), McDonough made two complaints about Hired Trucks to Vroustouris . . . ." (Pl.'s Resp., Dkt. No. 251, at 31) (citations omitted). However, the decision to place McDonough on administrative leave was the direct result of McDonough's residency interview with the IGO, which was originally scheduled to take place on October 6, 2004, more than two weeks prior to the date McDonough was placed on administrative leave. In other words, McDonough made these two Hired Truck complaints *after* the residency interview was to take place, so the Hired

Truck complaints could not have been said to have caused the residency interview or the resultant administrative leave.

In addition to timing, McDonough argues that Vroustouris took exceptional interest in McDonough's case, claiming,

> In contrast to the hundreds of hours that Vroustouris and his investigators spent on McDonough's residency case, Vroustouris never did anything to investigate any Hired Truck complaints. In fact, every time he got a complaint, he created a report and did nothing, or he simply referred the matter back to the department (Water, Transportation) that the complaint was about in the first place.

(*Id.* at 30) (citations omitted). The City Defendants assert that there was nothing unusual about McDonough's residency investigation:

> McDonough was one of 283 individuals against whom residency complaints were made to the IGO from 2002 to 2004. Of the resulting investigations by IGO, 22 of these 283 individuals either resigned or retired after being surveilled and interviewed by the IGO or were discharged or resigned after being presented with charges seeking their termination.

(Defs.' Joint SOF, Dkt. No. 237, ¶ 104 (citing Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 63).) McDonough objects to the description that the hours spent on the McDonough investigation were "comparable" to other cases, and points out that the IGO spent more hours on McDonough's case than on 15 of the aforementioned 22 cases. (Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 104.) According to the report provided, the number of hours spent on any individual case ranged from 68 to 437. (Defs.' Joint Materials in Supp. of Summ. J., Dkt. No. 236, Ex. 63.) The 285 hours spent on McDonough's case falls roughly within the middle of this range. Moreover, there is no requirement that the hours spent on McDonough's case be exactly the mean, mode, or median of the given set. The IGO investigation was instigated by three anonymous tips, which the IGO thereafter investigated. The evidence

presented is not sufficient for a reasonable jury to conclude that Vroustouris or anyone in his office treated McDonough's case any differently than any other case, or that such treatment was motivated by a desire to retaliate against McDonough for his protected speech.

In addition to trying to draw inferences from investigations that were allegedly different from his, McDonough also looks to evidence regarding investigations that he claims were *similar* to his. McDonough points to the testimony of Michael Fedanzo to support the assertion that the "IGO and City have used residency investigations to retaliate against other City workers who were outspoken about governmental waste and corruption." (Pl.'s Add'l SOF, Dkt. 252, ¶ 75 (citing Pl.'s Ex. KK, Dkt. No. 276).) Fedanzo claims to have worked as a consultant on several other cases involving residency investigations, and he stated, "The City of Chicago went after people, for lack of a better term, who were targeted as troublemakers." (Pl.'s Ex. KK, Dkt. No. 276, 34:17-24, 37:15-17.) Defendants object to this testimony, arguing, "Fedanzo is not qualified to give expert testimony, his testimony was based entirely on speculation, hearsay, and his unfounded personal opinions, and he admitted to having a severe personal bias against Vroustouris and the IGO." (Defs.' Joint Resp. to Pl.'s Add'l SOF, Dkt. No. 292, ¶ 75.) This court does not have any information, other than Fedanzo's testimony, regarding these other cases in which the City allegedly used residency investigations to go after whistleblowers, so it is unclear whether Fedanzo's generalization is entirely accurate, or to what extent those cases may or may not mirror McDonough's. However, even assuming that there were cases in the past in which the City targeted employees who complained about waste and corruption, there is still a lack of evidence that there was any such targeting or unfair treatment in McDonough's case. As

previously mentioned, McDonough is no longer pursuing his *Monell* claim against the City, thus limiting the relevance of any evidence of a pattern or practice of retaliation.

To conclude, summary judgment must be granted for Defendants with respect to McDonough's First Amendment claim to the extent that the claim is based on the IGO residency investigation and subsequent termination of McDonough's employment.

### 6. Adverse Conditions of Reinstatement

The final retaliatory action claimed by McDonough is that, after reinstatement, he was assigned to the Central District, which was farther from his home on Catalpa than the North District, where he had previously been assigned. (Pl.'s Resp., Dkt. No. 251, at 32.) McDonough names Talley and Murphy as the parties responsible for this assignment. (*Id.* at 32.)

The City Defendants explain the reason for McDonough's assignment to the Central District as follows:

> Before McDonough returned to work in 2006, Murphy asked Talley where Talley's Bureau was most in need of a plumber. Talley replied that it was the Central District; Central's leaders had been asking Talley for more plumbers for some time. At the time Murphy asked this question and Talley answered it, Talley did not know that Murphy's question had any relationship to McDonough. Murphy then decided to reinstate McDonough to Central based on its greater need for plumbers.

(City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 35-36 (citations omitted).) Attempting to rebut this explanation, McDonough states that there was a need for plumbers in the North District, as evidenced by the fact that there were open jobs in all three districts, including the North District. (Pl.'s Resp., Dkt. No. 251, at 33; Pl.'s Add'l SOF, Dkt. No. 252, ¶ 90.)

The City Defendants did not assert that there was *no* need for plumbers in the North District, but simply that the *greatest* need for plumbers existed in the Central District. To

provide additional evidence showing that the North District's need for plumbers was not that great, Talley states that from February 2006 to June 2008, he did not transfer any plumber to the North District because of staffing needs, and that the only plumber that was transferred (sometime in 2006) was transferred as part of a settlement with the union, not as a result of staffing needs. (Defs.' Joint SOF, Dkt. No. 237, ¶ 130.) McDonough admits this fact. (Pl.'s Resp. to Defs.' Joint SOF, Dkt. No. 250, ¶ 130.)

The City Defendants' explanation for McDonough's assignment to the Central District is rational and supported by the record, and McDonough has not provided sufficient evidence to allow a reasonable jury to conclude that the actual reason for the Central District assignment was retaliation for McDonough's protected speech.

D.    Qualified Immunity

Tierney, Rice, Murphy, Vroustouris, and Talley all argue that they are entitled to qualified immunity, because it cannot be shown that their conduct was objectively unreasonable in light of then-prevailing law. (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 42-44; City Defs.' Reply, Dkt. No. 291, at 26-27; Tierney's Mem. in Supp. of Summ. J., Dkt. No. 239, at 15; Tierney's Reply, Dkt. No. 288, at 15.) *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action"). Because this court has concluded that summary judgment is appropriately granted in favor of each of these individual defendants on McDonough's First Amendment claim, the court need not address the issue of qualified immunity with respect to these defendants.

Briatta, the only defendant remaining for McDonough's First Amendment claim, did not address the issue of qualified immunity in his filings. Accordingly, the court finds that Briatta has waived this defense. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("if [defendants] felt entitled to terminate the proceedings because of qualified immunity, they were required to bring that issue to the district court's attention").

III.    Count IV – Violation of *Shakman* Consent Decree

Count IV of McDonough's Amended Complaint alleges a violation of the *Shakman* Consent Decree. (Am. Compl., Dkt. No. 188, ¶¶ 61-72.) The 1972 Consent Decree entered in the *Shakman* case (69 CV 2145) prohibits the City from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." *O'Sullivan v. City of Chicago*, 396 F. 843, 848 (7th Cir. 2005). "Once a plaintiff shows this, the burden shifts to the defendant to show it would have made the same decision notwithstanding the protected conduct." *Shanahan v. City of Chicago*, 82 F.3d 776, 780 (7th Cir. 1996) (citing *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992)).

McDonough focuses on one category of allegedly retaliatory conduct addressed above, asserting that "the City and Tomczak based or affected the promotions that he applied for upon a political reason or factor." (Pl.'s Resp., Dkt. No. 251, at 34.) A list of the relevant promotions is provided earlier in this opinion.

The City Defendants argue that the applicable statute of limitations excludes all but one of the promotion claims. (City Defs.' Mem. in Supp. of Summ. J., Dkt. No. 235, at 50; City Defs.' Reply, Dkt. No. 291, at 27.) The Seventh Circuit has held that "the 180-day period of

limitations established by Title VII applies to contempt proceedings under the *Shakman* decree." *Smith v. City of Chicago*, 769, F.2d 408, 413 (7th Cir. 1985). Accordingly, the City Defendants argue, any claims based on conduct that occurred prior to November 16, 2005 are time-barred. As previously discussed, McDonough has not persuaded this court that the continuing violation doctrine should apply, therefore the only promotion on which McDonough can base his *Shakman* claim is his April 24, 2006 bid for the position of Assistant Superintendent, a position which was never filled. (Defs.' Joint SOF, Dkt. No. 237, ¶ 75.)

Because there is no evidence that the City considered any political factors in the decision not to promote McDonough to this position, to leave this position open, and to eventually eliminate this position, judgment must be entered for the City with respect to Count IV.

## IV. Count V – Illinois False Claims Act Retaliation

Count V of McDonough's Amended Complaint alleges a claim for retaliation under the Illinois False Claims Act. (Am. Compl., Dkt. No. 188, ¶¶ 73-76.) This claim is brought against the City. (*Id*.) The Illinois False Claims Act prohibits an employer from retaliating against an employee for having engaged in whistleblowing activities. 740 ILCS 175/4(g).

Once more, the City Defendants argue that McDonough's claim is at least partially barred by the statute of limitations. Citing to 745 ILCS § 10/8-101(a), the City Defendants point out that the applicable statute of limitations is one year, thus precluding this claim to the extent that it is based on conduct occurring prior to May 16, 2005. (City Defs.' Mem. in Supp. of Summ. J., Dkt No. 235, at 53.) Again, McDonough responds by arguing that the continuing violation doctrine applies, but the court rejects this argument for the reasons previously stated. To the extent the claim is based on conduct prior to May 16, 2005, it is time-barred.

With respect to conduct that occurred within the statute of limitations period, we look to the elements of this claim. In order to prevail, McDonough must show that "(1) his actions were taken 'in furtherance of' an [Illinois False Claims Act] enforcement action and were therefore protected by the statute; (2) that the employer had knowledge that he was engaged in this protected conduct; and (3) that the [adverse employment action] was motivated, at least in part, by the protected conduct." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002).

In examining Count I, the court concluded that the only allegedly retaliatory conduct that a reasonable jury could conclude was caused by McDonough's protected speech is the alleged harassment committed by Briatta. McDonough asserts that this harassment occurred on a regular basis until October 2004. (Pl.'s Add'l SOF, Dkt. No. 252, ¶ 47.) As the end date of the alleged harassment precedes the applicable statute of limitations date (May 16, 2005), this conduct cannot support McDonough's claim under the Illinois False Claims Act.

CONCLUSION

For the foregoing reasons, the court rules on the pending motions as follows. The City

Defendants' motion for summary judgment [234] and defendant Tierney's motion for summary

judgment [238] are each granted in their entirety. Defendant Briatta's motion for summary

judgment [230] is granted in all parts except it is denied with respect to Count I, the First

Amendment claim, to the extent that the claim relates to alleged harassment of plaintiff

committed by defendant Briatta. The parties are encouraged to discuss settlement. The case is

set for report on status at 9:00 a.m. on October 12, 2010.

ENTER:

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 29, 2010